**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No.   21-cr-495 (ABJ)** |
| | ) | |
| **DANIEL GRAY** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Under normal circumstances, Daniel Gray would not have been anywhere near the Capitol building on January 6, 2021. As his background and history suggests, it should have followed that at that time he would be focused on growing his career in martial arts education. Unfortunately, Mr. Gray was derailed through a perfect storm of circumstances that led him to a place he never would have dreamed – in the middle of the Capitol building advocating for a cause in the exact opposite way he would have if he was in his right state of mind. In his right state of mind, Mr. Gray is calm, intelligent, articulate, and empathetic. As the countless letters submitted on his behalf clearly demonstrate, the conduct for which he accepted responsibility for was completely outside of the character that Mr. Gray has displayed for the past four decades.

However, Mr. Gray has changed his life for the better ever since January 6, 2021, and has taken active steps to get his life on track so that something like this never happens again. He has also been extremely remorseful for how he handled himself on January 6, 2021, and has wanted to accept a guilty plea from day one.

1

For reasons further described below, negotiations were delayed for an extended period of time not due to Mr. Gray's own fault. However, all he has wanted to do from the start was to accept responsibility for his actions and to move on with his life in a productive manner.

In addition, what separates Mr. Gray from many other January 6 defendants is that rather than proceed with a stipulated trial to preserve his appeal rights, or attempt to delay sentencing due to the pending Supreme Court review in *Fischer*, Mr. Gray has made it clear that he does not wish to delay and simply wants to face what he has done. If he had proceeded with a stipulated trial, he perhaps would have been able to obtain relief if *Fischer* results in a defense favorable outcome. His guideline range in that scenario would be 24-30 months. For this reason among many, Mr. Gray requests a variance from his guideline range of 41-51 months.

Considering Mr. Gray's background and his conduct on January 6, and the rest of the 3553(a) factors, a significant variance below the guideline range is more than warranted.

## **BACKGROUND**

Before January 6, 2021, former President Trump encouraged millions of ordinary Americans to travel to D.C. to attend the "Stop the Steal" rally, where he would further encourage them to go to the Capitol building to protest the certification of the Electoral College vote. The former President summoned his supporters to D.C. based on claims that the 2020 Presidential election was "stolen"

from him.[1] This claim was repeated to the public over and over again, beginning immediately after the election when the former President falsely declared victory.[2] The former President led ordinary Americans like Mr. Gray, who were not experts in election law, to believe or suspect that irregularities existed in the election and vote count and that the purported fraud would be uncovered if people demanded action. He held rallies all over the country, repeating these claims and firing up his base of followers.

Below are examples of some of the political rhetoric that was spreading through the Trump supporter community prior to January 6, 2021, that came directly from former President Trump:

> WE HAVE JUST BEGUN TO FIGHT!!!
> ***Tweet from Trump on December 12, 2022***.[3]
>
> A great report by Peter. Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!
> ***Tweet from Trump on December 19***.[4]
>
> The Justice Department and the FBI have done nothing about the 2020 Presidential Election Voter Fraud, the biggest SCAM in our nation's history, despite overwhelming evidence. They should be ashamed. History will remember. Never give up. See everyone in D.C. on January 6th.[5]
> ***Trump tweet from December 26, 2022***.

---

[1] Shivaram, Deepa, *The House Jan. 6 committee releases its final report on the Capitol attack*, NPR, December 22, 2022, available at https://www.npr.org/2022/12/21/1144489935/january-6-committee-full-report-release.

[2] *Id.* at pg. 36 of final report.

[3] Sherman, Amy, *A Timeline of what Trump said before Jan. 6 Capitol riot*, Politifact, The Poyner Insttitute, January 11, 2021, available at https://www.politifact.com/article/2021/jan/11/timeline-what-trump-said-jan-6-capitol-riot/

[4] *Id.*

[5] *Id.*

If you are planning to attend peaceful protests in D.C. on the 6th, I recommend wearing a body camera. The more video angles of that day the better.
**Retweet by Trump on January 3, 2022.**[6]

If the liberal Democrats take the Senate and the White House – and they're not taking this White House – we're going to fight like hell, I'll tell you right now,"…We're going to take it back."
**Trump's words at a rally in Georgia on January 4, 2021.**[7]

If Vice President @Mike_Pence comes through for us, we will win the Presidency. Many States want to decertify the mistake they made in certifying incorrect and even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be). Mike can send it back!
**Tweet from former President Trump at 1:00 am on January 6, 2021.**[8]

Also at the same time, were groups such as Q'Anon, the Oathkeepers, and the Proud Boys who were spreading misinformation around the internet about the potential that former President Trump would declare martial law under some "legal" mechanism given the election irregularities. In turn, ordinary Americans, who were not part of any these groups still heard these messages through the social media grapevine.

On January 6, 2021, Mr. Gray attended the rally he was invited to by his President, where he listened to several speeches encouraging the crowd to march to the Capitol to "stand up for this country and stand up for what is right."[9] Former

---

[6] *Id.*

[7] *Id.*

[8] *January 6 Report* at 61.

[9] *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.

President Trump, after several minutes of reiterating his claims that the election was stolen, said the following to the crowd (including Mr. Gray) on January 6, 2021:

> We will not let them silence your voices. We're not going to let it happen, I'm not going to let it happen…..We're gathered together in the heart of our nation's capital for one very, very basic and simple reason – to save our democracy….Now, it is up to Congress to confront this egregious assault on our democracy. And after this, ***we're going to walk down, and I'll be there with you***, we're going to walk down…I know that everyone here will soon be marching over to the *Capitol building* to peacefully and patriotically make your voices heard….And they want to recertify their votes…**But the only way that can happen is if Mike Pence agrees to send it back…If not…you will have an illegitimate President.** That's what you'll have. And we can't let that happen…**We must stop the steal** and then we must ensure that such outrageous election fraud never happens again….**And we fight. We fight like hell**. **And if you don't fight like hell, you're not going to have a country anymore…..So we're going to, we're going to walk down Pennsylvania Avenue…And we're going to the Capitol, and we're going to try and give them the kind of pride and boldness that they need to take back our country.. So let's walk down Pennsylvania Ave**.[10]

Even as the Capitol building was under attack, President Trump did and said nothing for hours.[11] The only thing he did during the crucial hours of the attack was post a Tweet at 2:24 p.m. saying "Mike Pence didn't have the courage to do what should have been done to protect our country and our Constitution."[12]

---

[10] Associated Press, *Transcript of Trump's Speech at Rally Before US Capitol Riot*, U.S. News & World Report, Jan. 13, 2021, available at https://www.usnews.com/news/politics/articles/2021-01-13/transcript-of-trumps-speech-at-rally-before-us-capitol-riot (last viewed on Nov. 22, 2022). (emphases added).

[11] Jonathan Allen, *On Jan. 6, Trump ignored all pleas to call off the mob attacking the Capitol while 'pouring gasoline on fire' aide says*, NBC News, July 21, 2022, available at https://www.nbcnews.com/politics/congress/prime-time-jan-6-hearing-focuses-trumps-inaction-187-minutes-mayhem-rcna36737

[12] Ewan Palmer, *Donald Trump Tweeted Attack on Mike Pence Minutes After Hearing VP Was Fleeing Capitol Rioters*, Newsweek, February 11, 2021 available at

## ARGUMENT

### I.   Legal Standard

The Court is well aware that the Supreme Court's opinions in *Kimbrough v.
United* States, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007),
have dramatically altered the law of federal sentencing.  While courts must
continue to consider the sentencing guidelines, Congress has required federal courts
to impose the least amount of imprisonment necessary to accomplish the purposes
of sentencing as set forth in 18 U.S.C. §3553(a).[13]  As the Supreme Court made clear
in *Kimbrough* and *Gall*, the Sentencing Guidelines are simply an advisory tool to be
considered alongside other statutory considerations set forth in 18 U.S.C. §3553(a).

In two more summary reversals, the Court further clarified that the
Guidelines cannot be used as a substitute for a sentencing court's independent
determination of a just sentence based upon consideration of the statutory
sentencing factors.  *Nelson v. United States*, 129 S. Ct. 890 (2009), 2009 WL 160585
(Jan. 26, 2009); *Spears v. United States*, 129 S. Ct. 840 (2009), 2009 WL 129044
(Jan. 21, 2009).  "Our cases do not allow a sentencing court to presume that a
sentence within the applicable Guidelines range is reasonable," the Court held in

---

https://www.newsweek.com/donald-trump-tweeted-attack-mike-pence-minutes-capitol-
rioters-1568568. (last viewed on November 29, 2022).
[13] Those factors include (a) the nature and circumstances of the offense and history and
characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory
guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for
restitution; and (f) the need for the sentence to reflect the following: the seriousness of the
offense, promotion of respect for the law and just punishment for the offense, provision of
adequate deterrence, protection of the public from future crimes and providing the
defendant with needed educational and vocational training, medical care, or other
correctional treatment.  *See* 18 U.S.C. §3553(a).

*Nelson.* 2009 WL 160585, at *1. "The Guidelines are not only *not mandatory* on sentencing courts; they are also not be presumed reasonable." *Id.* At *2. In other words, a sentencing court may not rely on the Sentencing Guidelines range as a default to be imposed unless a basis exists to impose a sentence inside that range. Rather, the court must weigh each of the factors and impose a sentence that constitutes the least amount of imprisonment necessary pursuant to Section 3553(a).

## II.   Imposing a Variant Sentence is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).

### a. Mr. Gray's Personal History and Characteristics

Mr. Gray has had both a challenging and fascinating past. He was born in Blackpool, England with three other siblings. Although Mr. Gray's father was an American citizen, he met his mother in Germany on a church mission trip and decided to start a life together in England, where Mr. Gray's mother was born. Devastatingly, one of Mr. Gray's younger siblings, was born with a severe medical condition that required extensive care. The family decided to relocate to the United States where they believed she would receive better medical care. Tragically, she died when Mr. Gray was only 8 years old. Also unfortunate is how her death divided the family, caused his parent's divorce when he was 11 years old, and has still caused family turmoil until the present day.

Mr. Gray remained in his father's residence, however his younger brother lived with his mother while his older brother was on his own attending school abroad. Unfortunately, the division occurred because Mr. Gray's mother blamed his

father for what happened to their daughter. After already having a rocky relationship with his mother, Mr. Gray was never able to fully recover his relationship with his mother after his sister's passing.

Although Mr. Gray's father is a great man, growing up with his father had its challenges given the tough circumstances. Firstly, they had to move around a lot because of his father's career in government IT. Second, his father worked all the time and dated other women, leaving him home alone quite often. Not only did his father have busy jobs working in IT (at points for NASA and the Pentagon), but he also tried to distract himself from the pain of what happened to his daughter by being a workaholic. Sadly, Mr. Gray did not have any siblings living in the household and was lonely and unsupervised. Despite this, Mr. Gray currently has a great relationship with his father and he believes that his sister's death put a huge strain on his father growing up.

Given Mr. Gray's tough circumstances during his formative years, he did not do well in school and dropped out of high school. He went on to completing his GED at the age of 17. He moved out of his father's house shortly thereafter and began working and providing for himself. When he was 18 years old, Mr. Gray's father offered to pay for him to receive higher education in Exeter, England at the Exeter Tutorial College, which is a highly reputable private school that helps individuals get admitted to top notch universities. For the first time in his life, Mr. Gray became highly motivated to succeed and achieved decent grades in a very

competitive environment. However, rather than pursuing University, Mr. Gray did not wish to reside in England anymore and returned to the United States.

Still highly motivated, however, Mr. Gray began working and providing for himself while residing in Florida. He found that he was passionate about mixed martial arts ("MMA") and began competing professionally while pursuing a career in MMA education.



He began teaching youth and found that he enjoyed working with young individuals. Mr. Gray advanced quickly in this field and started directing programs. It was around this time that Mr. Gray met his ex-wife, who he married after a few years of dating. Mr. Gray and his wife moved to Taiwan in 2010 when Mr. Gray was invited to start an MMA gym to continue his career in teaching. His wife also found a teaching position there. Mr. Gray and his wife lived in Taiwan for three years both teaching and being immersed in the Taiwanese community.





Mr. Gray would have loved to stay in Asia to continue his blossoming career and be the owner of his own gym, however in 2013, he and his wife returned to the United States. Residing in a foreign country and not knowing the language proved to be challenging for Mr. Gray's wife and her mental health declined as a result. After several years of having a wonderful marriage, Mr. Gray describes this period

as being the first time their marriage began to suffer. So Mr. Gray decided to return with his wife to Florida so that he could make his wife happy.

When they returned, Mr. Gray continued to advance in his career and was a program director at an MMA school continuing to work with children.[14]



Unfortunately, around this time, Mr. Gray began to struggle with his path in life and whether or not doing something different with more earning potential was something he should consider. This mindset is something he regrets today. Perhaps he longed for the adventure of being overseas but he became slowly despondent and began struggling with alcohol abuse. His wife also struggled with alcohol abuse and the overuse from both spouses further strained their marriage.

---

[14] *See also* Exhibits A-O for more photographs and videos of Mr. Gray teaching as well as letters from his students. These exhibits will be provided to the Court and the government through a box.com link.

In 2016, Mr. Gray was offered an excellent position at a reputable company in Atlanta where he would be in a leadership role as general manager. He accepted the position and continued teaching.



Unfortunately, Mr. Gray's wife did not adjust well from living in a small southern town to the big city of Atlanta. Mr. Gray also still struggled with his path in life and things went downhill for the both of them very quickly. They both continued to abuse alcohol and Mr. Gray began associating with individuals who hampered his potential. Their marriage ended just a couple years later, and shortly before the instant offense. The end of this marriage of 10 years caused Mr. Gray to spiral even more downwards and for the first time in his life, he began using cocaine after he chose to move to Las Vegas after their separation. He also quit his amazing job in Atlanta. While in Vegas, Mr. Gray engaged in risky behavior and ended up in the hospital after overdosing on drugs. He hit complete rock bottom, or so he thought.

The COVID pandemic began and Mr. Gray left Vegas to stay with his father in Texas at the age of 40. Unfortunately, his father could not tolerate his drug use and alcohol use and his father asked him to leave. Mr. Gray went from being a highly successful individual to a drug addict with no job and no home in just one year. During this time, Mr. Gray became engulfed in politics for the first time. Before 2016, he never engaged much in politics until President Trump's reign. Unfortunately, his mental state steered him in the direction of the most extreme political views – ones he ordinarily would have stayed away from.

After moving back to Atlanta, Mr. Gray was able to get his job back, however his mental state was still in complete disarray and he was still abusing substances. This was in the thick of the pre-January 6 cesspool of information being spread online and unfortunately Mr. Gray was an easy target at the time. Not only was Mr. Gray subscribing to unproductive ideas, he had a reckless disregard for his own well-being. Prior to the instant offense, Mr. Gray did not have a stable residence and would often sleep on a friend's couch or in his car. In fact, after the instant arrest, he was completely homeless.

After Mr. Gray was arrested for this offense and released on conditions, he changed his life entirely. Even though he was homeless, he stayed with a friend in Jacksonville, Florida and began working his way up to the stability he has now. He also became sober and felt extreme remorse for his actions. Mr. Gray began reconnecting with the positive influences in his life and disconnecting from all of the nonsense that led him to this offense in the first place. Mr. Gray wrote a detailed

letter about his background and history and remorse for the instant offense where

he says, among many other things,

> In the time since my arrest I have achieved a certain amount of clarity.
> In the two years prior to January 6th I had fallen into despair. I was
> willfully inviting death and destruction into my life. There were so
> many dangerous situations that I was placing myself into. I had
> become completely self-destructive. On January 6th the police would
> have been well within their rights to shoot me. I can confidently say
> that I have no one to blame but myself for my actions. I became
> completely unhinged in my life, I attached myself to outcomes that
> were outside my control, and people who will never even know my
> name. I willfully ruined my life and this is all my fault. There is no
> great conspiracy, I saw an incredibly volatile and dangerous situation
> and I dived in head first. I am ashamed of myself and my actions, and I
> am in complete shock at the level at which I was able to destroy my
> life. This is all my fault.

*See* Exhibit 1, Letter from Daniel Gray.

Mr. Gray now has a stable residence with a long term girlfriend and stable

employment where he clearly succeeds and displays the integrity and work ethic

that mirrors the Daniel Gray that worked hard his whole life to be successful and

reputable. He currently works at the Crowne Plaza Hotel and Convention Center as

a bartender. His employer speaks very highly of Mr. Gray's customer service skills

and work ethic when he explains:

> He has been instrumental in helping maintain my overall food and
> beverage guest satisfaction scores…Daniel is thoughtful, considerate of
> all his coworkers needs, and extremely honest..I hired him because I
> know the man he is. I have not regretted my decision for one second.

*See* Exhibit 2, Letter from Employer.

### b. Nature and Circumstances of the Offense

Mr. Gray's change of attitude and perspective since his offense conduct also shaped how he approached his criminal case. Rather than join the "political prisoner" mentality, Mr. Gray acknowledged the reality of the damage he and others caused on January 6, 2021. In fact, he wished to resolve his case as soon as possible. Unfortunately, the government's original plea offer (other than offering no discernable benefit) would have forced him to admit to something that was simply not true – that he intentionally pushed a female police officer down a flight of stairs. Despite the fact that the government wanted Mr. Gray to accept responsibility for two serious felony charges, the only thing Mr. Gray cared about was the language in the statement of offense – making it clear he would plead guilty to two felonies if the language reflected his actions that day.[15] While Mr. Gray fully admitted to assaulting the female officer by raising his arm and making contact with her baton, he did not push her down the stairs. From the start, the only thing Mr. Gray has asked was for the government to review the evidence and see that their initial assessment of the stair incident was not correct so that a few sentences could be adjusted in the statement of offense. This change would not affect the charges or the severity of the guidelines but it was important to Mr. Gray to be honest about what he did and honest about what he did not do.

Mr. Gray and undersigned counsel also discussed his option of proceeding with a stipulated bench trial. However, Mr. Gray did not wish to portray anything

---

[15] Counsel made unsuccessful efforts to negotiate a plea that would not entail a plea of guilty to 18 U.S.C. § 1512 (c) (2). Attempts were also made to secure a plea to 18 U.S.C. § 231(a)(3).

but complete acceptance and feared that the Court would view a bench trial as him not fully facing his actions. He also wishes desperately to move on with his life and does not wish to put the Court or himself through the future potential litigation regarding the validity of 18 U.S.C. § 1512(c)(2). After change of counsel and then return to original counsel, the government agreed to change the language ever so slightly to allow Mr. Gray to argue the facts that are supported by the video evidence in this case. The second that the government agreed to this small change, Mr. Gray signed the plea paperwork. He now is prepared to face the Court and accept whatever consequences it deems appropriate based on a thorough review of his role on January 6, 2021.

On January 6, 2021, Mr. Gray traveled alone to D.C. and certainly was not a part of any organized groups. He did not have weapons or any riot gear. Men like Mr. Gray were not only pawns of the Trump campaign, but more organized groups on January 6, 2021, like the Proud Boys, who also intended to rile up normal people in the crowd to serve their agenda. The New York Times investigated this dynamic and learned that there were different groups who went to the Capitol building, ones that simply intended to protest peacefully and others with a plan to incite the crowd and breach the building.[16] The Proud Boys called people like Mr. Gray "normies" and had an intent to rile them up in order to support their agenda.[17] Mr. Gray went

---

[16] New York Times, Proud Boys Led Major Breaches on Jan. 6 Video, July 11, 2022, available at https://www.nytimes.com/2022/07/12/us/politics/proud-boys-jan-6.html (last viewed on April 7, 2023).

[17] Reneau, Natalie, New York Times, How the Proud Boys Breached the Capitol on Jan. 6: Rile up the Normies, June 17, 2022, available at

to D.C. naively being completely unaware of the powers at be that had paved the way for the perfect storm of January 6. He was used to serve a purpose and is now a two time felon because of it. In the sentencing of Andrew Cavanaugh, the Honorable Amit P. Mehta opined that perhaps some January 6 defendants are victims too and were ordinary Americans with no criminal history who were subject to the "power of being told lies over and over again by leaders who knew better." *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 26-27.

On January 6, 2021, Mr. Gray attended the former President's rally with the rest of the thousands of mostly "normies." He heard the former President's entire speech and it was only after the speech was over and he was told by Donald Trump to go to the Capitol Grounds that he followed the huge crowd over there. This is notable because many individuals with pre-planned nefarious ideas were already at the Capitol building before Trump's speech was over. The first breach of the Capitol grounds occurred at 12:53 pm at the Peace Circle. At this time, Mr. Gray was still intently listening to his President speak with no pre-planned nefarious ideas.

By the time Mr. Gray reached the Capitol Grounds, he was one among thousands of individuals making their way on the grassy area towards the upper west plaza after the violent pushing of the barricades that led to police retreating in that area. He was not among the individuals that contributed to this breach and he made his way through this area at approximately 2:30pm.

---

https://www.nytimes.com/video/us/politics/100000008392796/rile-up-the-normies-how-proud-boys-breached-the-capitol.html





Mr. Gray followed many other individuals who were chanting patriotic songs and waving flags up the stairs of the west terrace.



While this in no way excuses the actions of Mr. Gray that day, it is important to explain that while outside of the building, Mr. Gray was inadvertently near a rowdy crowd that resulted in his phone being snatched by a police officer.



*See* Exhibit 3, M.B. Body Worn Camera (BWC) at time stamp 14:25-14:26pm. When Mr. Gray entered into the Capitol building through the upper west terrace door, he made his way to the Rotunda and then at some point saw the same police officer he believed took his phone and he begged several times for it to be returned.



*See* Exhibit 4, T.C. BWC at time stamp 14:58-41 pm. So unlike the rowdy and disrespectful individuals screaming at police next to him, Mr. Gray respectfully and calmly pleaded for his phone to be returned. Unfortunately, the tension of the crowd created an uneasy and chaotic vibe that influenced Mr. Gray. With his frustration over his phone in addition, Mr. Gray made a horrible split second mistake in a brief moment when a scuffle arose (that he did not start) with the police and the rowdy crowd. Mr. Gray met the police resistance by grabbing a police officer's baton to prevent it from hitting him. Now, as Mr. Gray described in his letter to the Court, the police *had every right* to meet that crowd with force. He is extremely regretful for his actions to use force that day against an officer no matter what the circumstances. Mr. Gray fully acknowledges that he put himself in that position.

While Mr. Gray did assault an officer, he did not push her down the stairs that was located behind the officers resisting the crowd. In fact, a detailed review of the video evidence shows that another individual was likely the cause of the fall. Mr. Gray, however, acknowledges that his actions contributed to this female officer being overwhelmed and not able to control herself before falling. Granted, the scuffle happened very quickly and it is difficult to ascertain exactly what is occurring in the BWC, it still points to a period of time in between Mr. Gray's assault and the assault that *directly* led to the officer falling down the stairs – a period of time that Mr. Gray was further back and not by the officer who fell. Taking a look at this officer's BWC, we can see Mr. Gray caught in the middle of a scuffle where multiple people are trying to break the police line. We can see Mr.

Gray initially raise his winter glove up in the air indicating he did not wish to engage.



*See* Exhibit 3 at 15:01:45 pm. Then you can see Mr. Gray grab the officer's baton at 15:01:47 pm. *Id*.



Approximately 26 seconds later, from another BWC camera, another individual is seen next to Mr. Gray pushing forward with his head.



Going a little back in time, six seconds before Mr. Gray grabs the officer's baton, the same individual depicted (herein after "man wearing plaid") above is directly in front of the female officer and her hand and baton are over the top of him.



*See* Exhibit 3 at 15:01:38pm. Then just a few seconds later, you can see Mr. Gray face the female officer with the man wearing plaid depicted above in between Mr. Gray and the female officer (image on left). *Id*. at 15:01:44pm. From another officer BWC, you can see the angle of this individual's feet either pushing or falling (image on right).



Then, one second later, another individual (black sleeve with white and blue markings) reaches forward over Mr. Gray's shoulder while the man wearing plaid is still between Mr. Gray and the female officer.



*Id.* at 15:01:45. The following still frames show how right before the female officer's fall, there was another individual in front of Mr. Gray at all times. It also appears as though Mr. Gray is being sandwiched in front of him and behind him.







As the last image shows (as well as the zoomed in version), the female officer appears to be struggling to regain her balance and that directly behind her is the man wearing plaid, not Mr. Gray. *See* Exhibit 5, T.C. BWC at time stamp 15:01:52 pm. In fact, the very next second, Mr. Gray is shown further up from where this female officer is at this point with his right hand held up.



The second that this officer falls backward, Mr. Gray is clearly not in front of her.



*See* Exhibit 3 at 3:01:55pm (image on left), and Exhibit 6, F.D. BWC at time stamp 15:01:55 (image on right). In fact, the next second (and 3 seconds before the fall) you can see Mr. Gray a row behind and in front of another police officer.



A different angle from behind shows the female officer continue to fall down the stairs. The time stamps between the still shot where Mr. Gray is and the officer falling down the stairs is just 3 seconds – making it impossible for Mr. Gray to have pushed her down the stairs.



*See* Exhibit 7, N. R. BWC at 15:01:55-59. So while Mr. Gray takes full responsibility for his actions that contributed to the chaos during this incident, this distinction is important because it shows he did not push this officer down the stairs and had no intention of doing so.

The government has also brought attention to an incident that occurred before the stair incident when Mr. Gray first walked into the Capitol building and walked through the Senate Hallway. At that point (approximately 2:49pm), there were individuals who were trying to get past officers and some even made it through to the stairwell in that area. Mr. Gray, in his statement of offense, admitted to pushing with a crowd toward the line of officers and veering to the left into a small staircase. However, notably, Mr. Gray did not continue up the stairs and turned back and returned to where he came from and made his way toward the Rotunda. This shows that while his actions were regrettable, he did not intend on advancing further into the building or being some kind of leader that day.

Lastly, after January 6, 2021, Mr. Gray cooperated with the FBI's execution of a search warrant and provided access to his cellular telephone – which

incriminated him. He was respectful and decent to agents with whom he interacted. He was cooperative with the investigation and has attended all of his pre-trial and trial court hearings.  The Court no doubt noticed that Mr. Gray was respectful to the Court, his counsel, court personnel, and the government throughout the proceedings.

This unfortunate phase in Mr. Gray's life is contrasted greatly by all of the wonderful things he has done and positive contributions he has made to his community. This aberrant behavior is so unlike his usual character as shown by the many wonderful letters submitted to the Court. *See* Exhibit 8, Letters of Support. What is also notable in these letters is that Mr. Gray has expressed remorse to his friends and family. Raymond Wong writes that "he has expressed remorse over his actions. He sincerely wishes that it had never happened…he is deeply regretful." *Id*. In another touching letter, his friend Aaron Petty describes how when Mr. Gray was released from the instant offense, homeless and disheveled, he took him into his home and helped him obtain sobriety. He explains that Mr. Gray also helped him by saying:

> With Daniel's help getting fit, I was able to stop taking multiple medications used to stabilize my blood pressure, cholesterol, and triglycerides. My doctor was thrilled with my progress and so am I. All of this I attribute to Daniel's help….He is positive, goal oriented, and doing everything it takes to better himself.

*Id*. Another friend attests that he has witnessed "Daniel's kindness, compassion, and commitment to those around him," and has "witnessed on many occasions

28

Daniel Gray has been actively involved in community service and volunteer work." *Id*. Letter from Alex Vugman.

Mr. Gray's family, including his Aunt Katy, describes him as "generous to a fault; he'll give you the shirt off his back if you need it, no questions asked." *Id*. When discussing January 6, his aunt explains "he and I have wept together over, and he has shared his great remorse." *Id*.

Mr. Gray's girlfriend of two years, Korey Mills, also writes to the Court explaining that "quickly after becoming in Daniel's day-to-day life, it was blindingly apparent to not only me but all those around him that he makes every room he is in a little brighter." *Id*. She also explains that "he has made some of the biggest mistakes one can make and I know in my core he regrets his actions. He is no longer lost." *Id*.

### c. The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate Deterrence, and the Need to Avoid Unwanted Sentencing Disparities

Based on the past three years, the Court can be assured that Mr. Gray will not repeat the same conduct. Firstly, Mr. Gray's compliance on pre-trial supervision has been almost perfect (minus a missed reporting phone call early on). Second, in the past 3 years he has shown that his focus is solely on work, rebuilding his life, and creating and sustaining positive relationships. He is not focused on politics and will not fall into the dangerous mentality that led to his conduct ever again. Furthermore, Mr. Gray is now a felon and will have to deal with the collateral consequences that stem from that for the rest of his life. He has already been

severely punished for what he did, including the media backlash that occurred after his arrest that painted him as a violent and crazed man. As a result of being in the spotlight in the most negative way, Mr. Gray lost many relationships and felt shame and embarrassment for a long time. As other judges in this district have recognized, there are many other ways an individual can be punished besides jail time:

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.

*United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 29.

Although there are no cases that are identical, a review of past January 6 sentences imposed for other defendants convicted of similar and more aggravating conduct further demonstrates that a significant variance is warranted in the instant case.[18]

> • *US v. Brian Gunderson*, 21-cr-137 (RC): Mr. Gunderson was sentenced to 18 months' incarceration after being convicted of the same charges as Mr. Gray. Mr. Gunderson also had many mitigating circumstances and was remorseful for his conduct. Their conduct was similar in that both involved brief physical contact with a police officer's weapon. In *Gunderson*, it was a riot shield while in this matter it was a police officer's

---

[18] This analysis in no way suggests that the sentences imposed were appropriate and are based on what was provided on the public docket regarding government allegations and defendant admissions.

baton. Because *Gunderson* was a stipulated bench trial, the Court did not find the 8 level enhancement in U.S.S.G. §2J1.2 to apply at sentencing and as such his sentencing guidelines were lower than Mr. Gray's guidelines.

• *US v. James McNamara*, 23-cr-119 (ABJ): While Mr. McNamara only pled guilty to one count of 18 U.S.C. §111(a), this case is still worth highlighting for a few reasons. First, Mr. McNamara was sentenced to 12 months' incarceration, a variance below the guideline range of 24-30 months. While Mr. Gray's guidelines are higher and driven by the Obstruction count, Mr. McNamara's forceful conduct appeared to be more aggravating than Mr. Gray's use of force. Mr. McNamara allegedly swung at a police officer with a *closed fist* and grabbed a metal barricade and slammed it into an area the police were trying to secure. While it is difficult to compare force, Mr. McNamara seemed to have more aggression in his overall conduct. Like Mr. Gray, however, Mr. McNamara also seemed to have a challenging and complex background.

• *US v. Troy Sargent,* 21-cr-258 (TFH): Defendant was sentenced to 14 months' incarceration after convictions for Civil Disorder and Assault on a Police Officer. Similarly to Mr. McNamara, Mr. Sargent admitted to trying to swing at an officer with his open hands twice. He also admitted to posting a message after January 6, 2021, that he had hit a police officer

twice. However, he also accepted responsibility early and had a challenging past.

- *US v. Kevin Creek*, 21-cr-645 (DLF): Mr. Creek was sentenced to 27 months' incarceration after pleading guilty to one count of Assault on a Police Officer. Mr. Creek admitted to hitting a police officer in the face shield of his helmet to try to get past a bike rack barrier. He also admitted to shoving and kicking another officer causing him to fall to the ground. While he entered a guilty plea, he allegedly denied the conduct to which he pled guilty and did not express remorse for his actions.  To the contrary, Mr. Gray has been remorseful since day one.

- *US v. Matthew Miller,* 1:21-cr-075 (RDM): Mr. Miller was sentenced to 33 months' incarceration after pleading guilty to Obstruction of an Official Proceeding and Assault on an Officer. Mr. Miller admitted to throwing objects at officers in the lower west terrace at the time that hundreds of rioters were trying gain entry to that tunnel. This was the most chaotic and violent scene at the Capitol that day. Mr. Miller's conduct is an example of a case that is more aggravating than Mr. Gray's conduct. While Mr. Gray made a horrible split second decision mistake, it did not compare to horrific activities at the lower west terrace tunnel.

Lastly, while Mr. Gray was not convicted of Civil Disorder, it is worthwhile to consider the sentences imposed in cases where defendants were convicted of Civil Disorder because while the sentencing guidelines are substantially lower, the

overall conduct in those some of those matters involves "assaultive" conduct even though they were not ultimately convicted of assault.

- *US v. Ronnie Presley*, 21-cr-257 (RDM): Mr. Presley was sentenced to 12 months incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Like Mr. Gray, Mr. Presley also met officer resistance by leaning into the officer's baton that the officer was holding up. He admitted to later grabbing and pulling on an officer's riot shield.

- *US v. David Blair,* 21-cr-186 (CRC): Mr. Blair was sentenced to 5 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Blair was accused of bringing tactical gloves, carrying a lacrosse stick with a large Confederate flag attached to it and using that stick to push against a police officer's chest. The government also alleged he carried a backpack with a knife and roll of duct tape inside.  Mr. Blair never made it inside the Capitol building because he was detained on the spot after allegedly assaulting officers with his stick.

- *US v. Daniel Johnson,* 21-cr-407 (DLF): Mr. Johnson was sentenced to 4 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Johnson allegedly pushed against a line of officers who were guarding the East Rotunda doors trying to prevent rioters from gaining entry to the building. The pushing of rioters caused these officers to be sandwiched against the doors and the effort of the rioters were successful as that door

was breached. Mr. Johnson also allegedly said afterwards that he was trying

to find a way into the Senate Chamber.

- *US v. Robert Fairchild*, 21-cr-551 (TFH): Mr. Fairchild was sentenced to 6

   months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr.

   Fairchild admitted to engaging with officers to try to break through the metal

   barriers making contact with law enforcement with his back and shoulders as

   he tried to tussle with the barriers to breach the area.

## General Deterrence

Sentencing Mr. Gray to a significant period of incarceration is not the way to

ensure that the isolated events on January 6 will never occur again. An event like

January 6 is unlikely to happen again[19] Empirical evidence proves that the

certainty of prosecution, rather than the severity of the punishment is the greater

deterrent.[20] Individuals like Mr. Gray, who have minimal criminal history, have

already been deterred by this threat of prosecution. Most individuals involved in

January 6, 2021, were encouraged to do what they did by the most powerful

executive in our country and yet the government has not hesitated to prosecute

these individuals to the fullest extent possible. Individuals like Mr. Gray, who are

not activists, and who have previously led simple law abiding lives, would be

---

[19] *See* transcript of video sentencing in *United States v. Douglas Swee*t, 21CR41-3 (The
Honorable Judge Nichols states, "It is unlikely that the circumstances of led to their actions
on January 6 will occur again. It is unlikely that the sitting President will invite them, as
part of a large crow, to protest and demonstrate, even fight at the Capitol. . .").
[20] *See* National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), full article
available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence

deterred just by the prospect of such a harsh prosecution and the collateral consequences that result from a felony conviction. For these reasons, the goal of general deterrence would be more than met by a variant sentence.

## CONCLUSION

For the reasons stated above, Mr. Gray respectfully requests that the Court grant a significant variance based on the factors outlined in 3553(a).

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Maria N. Jacob
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Maria_jacob@fd.org