**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-495 (ABJ)** |
| **DANIEL GRAY,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Daniel Gray to 51 months' incarceration, 3 years' supervised release, $2,000 restitution, and $200 special assessment. The government's custodial recommendation is the midpoint of the guidelines range.

**I.     INTRODUCTION**

The defendant, Daniel Gray, viciously participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Prior to January 6, 2021, Gray stated he was "actually really excited at the possibility of the insurrection act being implemented."   He also was excited to join "the militia" that planned to "get lit" at the Capitol on January 6.   Then, on January 6, he followed through on that plan.   While on Capitol grounds and inside the U.S. Capitol Building, at least twice, Gray, who has taught mixed martial arts, engaged in physical altercations with police who were attempting to protect the Building, the Senators, and Members of Congress attempting to perform their Constitutional duties inside.   Gray's assault on one police officer caused her to fall down a set of stairs, hitting her head and cracking her bicycle helmet.   She endured serious bodily injury from that event, and still believes she suffers from post-traumatic stress disorder more generally.

Gray not only expressed on social media his excitement for the anticipated violence prior to January 6, but he gleefully posted about and discussed his successes after he committed his crimes.   After January 6, for example, he stated, "Dude we literally took congress over. I don't wanna say too much more lol was the rowdiest thing I've ever done."   He also specifically acknowledged his assaultive conduct:   "We pushed [police] out the back door of the capital. Pretty sure I can put tear gas on my eggs for breakfast now lol."   Therefore, the government recommends that the Court sentence Gray to 51 months of incarceration, which reflects the gravity of Gray's conduct, but also acknowledges his admission of guilt.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case,

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

ECF 94, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.     Gray's Role in the January 6, 2021 Attack on the Capitol**

*Pre-January 6 Social Media*

In the days leading up to January 6, 2021, Daniel Gray, a former Mixed Marital Arts ("MMA") instructor and bartender, was very active on social media expressing his distrust of the 2020 presidential election results and his eagerness to prevent Joe Biden from becoming president. Various Facebook posts and messages represent the general tenor of his social media activity.

On December 12, 2020, Gray posted to Facebook a screenshot of the Wikipedia page for the Insurrection Act of 1807, and then captioned the picture with, "Shits about to get lit y'all.   I'm actually really excited at the possibility of the insurrection act being implemented."   In a comment on the picture, he stated, "lol nope I'm excited about the possibility of the militia being called up by the President.   Militia finna be lit bro[.]"   The same day, Gray sent a private Facebook message to another user, stating, "Bro I just joined the militia."

Also on December 12, 2020, Gray posted about potential events at the Capitol on January 6, 2021. Specifically, he posted a status saying, in part, "Here is the move y'all. If they intend to certify a false election it's gonna have to be to our faces."   He then commented on another user's post with the following: "the only day that matters is the 20th. On the 6th a f[*]cking sh[*]t ton of us are going to Washington to shut the entire city down. It's gonna be insane I literally can't wait."   In a private message to another user, Gray asked, "are you gonna be in DC on the 6th like trump asked us to be?"

On December 21, 2021, Gray posted to Facebook a screenshot of a video post that was originally captioned "HAPPENING NOW – Crowd trying to force their way into the State Capital building in #Oregon."   Gray included his own caption, stating, "Lol wait until the 6th in D.C.   If the electors are gonna certify a fraudulent election they are gonna have to do it in front of like 2 million ppl.   Fuck around and find out season is here y'all!"

### *Gray's Approach to the U.S. Capitol building on January 6*

On January 6, 2021, Gray violently participated in the January 6 attack on the Capitol.   His crimes are documented through a series of videos provided to the FBI by concerned citizens, body worn cameras from the Metropolitan Police Department ("MPD"), open-source and other video, and surveillance footage from inside of the Capitol.   For example, in one selfie-style video obtained from Gray's social media accounts, Gray is seen near the Washington Monument, excitedly exclaiming as follows: "Fucking shit! [Laughter] Trump just told every single fucking Patriot to march down Pennsylvania Avenue to Congress!   [Laughter]   Fuck around and find out!?!"



***Image 1: Screenshot from Ex. 1; Gray in the foreground.***

By 2:25 p.m., Gray was at the front of the mob confronting the police line on the lower west plaza steps outside the U.S. Capitol, which is shown as location "A" in Image 2, below.



*Image 2: 3-D Rendering Depicting Gray's Movement through*
*Capitol Grounds & Capitol Building*

Gray is seen in the below still shot from MPD body-worn camera wearing a black beanie hat and gray/brown jacket.



*Image 3: Screenshot from Ex. 2 at 00:24 seconds; Gray circled in red.*

### *Gray's Breach of the U.S. Capitol Building*

Shortly thereafter, the police line broke, and Gray joined the mob advancing toward the retreating police line on the west plaza.   Then, after making his way through the crowd that approached the U.S. Capitol Building, Gray forced his way to the front of the line of rioters who were confronting officers at U.S. Capitol Building's Upper West Terrace Doors, which are shown in Image 2 as location "B."   There, Gray engaged with officers protecting that door, pointing at them as he appeared to be trying to convince them to retreat and let the mob in.   At approximately 2:41 p.m., he succeeded, and entered the building through the Upper West Terrace Doors, as shown below.



*Image 4: Screenshot from Ex. 3 at 1:31 seconds; Gray's head and hand circled in red as he pointed at the officers.*

### <u>Gray's Aggressive Conduct in the Senate Wing Corridor</u>

At 2:45 p.m., Gray entered the Rotunda and, less than a minute later, exited the Rotunda heading north toward the Senate chamber.   By 2:47 p.m., Gray joined a group of rioters in the second-floor main hallway, north of the Small Senate Rotunda; his pathway is shown in Image 2 as location "C."   The rioters were confronting a line of MPD officers that had formed to prevent the loud mob from getting closer to the Senate Chamber.   As the mob began pushing the line of officers, Gray turned to the rioters behind him and yelled, "Push! Push!"



***Image 5: Screenshot from Ex. 4 at 00:44 seconds; Gray circled in red.***

Within seconds, the mob surged forward and broke the police line.   Gray and a few other rioters pushed police officers into a small adjacent staircase.   At 2:49 p.m., MPD Officer K.H. was at the base of the stairs with his back to the rioters and his arms stretched out to his sides, blocking the rioters from advancing up the steps.   Gray pressed his chest against Officer K.H.'s back and placed his arms around Officer K.H.'s shoulders and grabbed him.   As Officer K.H. twisted away from Gray, Gray squeezed behind him and up the stairs.



*Image 6: Screenshot from Ex. 5 at 01:40 seconds;*
*Gray's head and hand circled in red, Officer K.H.'s head and hand circled in blue.*



*Image 7: Screenshot from Ex. 5 at 01:47 seconds;*
*Gray circled in red, Officer K.H. circled in blue.*

Gray returned down the stairs, past Officer K.H., and back into the Rotunda at 2:51 p.m.

### *Gray's Assault on MPD Officer M.B.*

At 2:57 p.m., Gray walked to the west side of the Rotunda, shown in Image 2 as location "D," where another rioter was yelling at a line of MPD and U.S. Capitol Police ("USCP") officers, "We want them out here!   You bring them out or we're coming in.   Bring them out!   Bring them out now!   They're criminals and they need to hang!   They need to hang!"   Seconds later, Gray turned around and beckoned with his hands toward other rioters in the Rotunda to join the mob confronting the line of police officers.

Between 2:58 p.m. and 3:01 p.m., Gray and other rioters pushed back the police line and advanced from the Rotunda toward a small room west of the Rotunda.   Gray was at the front of the mob.   As a result of the push, the police officers were backed up against the Western Rotunda staircase that led down to the Upper West Terrace Doors, where Gray initially entered, breaching the U.S. Capitol building less than 20 minutes earlier.   From where the line of police officers stood, there were 14 marble steps down to a small landing area, and then another 18 marble steps down to the first floor of the U.S. Capitol building.

At 3:01 p.m., MPD Officer M.B. was at the top of the steps when Gray grabbed her baton, causing her to lose her balance and fall down the stairs.   Officer M.B.'s body-worn camera captured Gray's assault, as shown in Images 8-9 below.



***Images 8, 9: Screenshots from Ex. 6 at 4:05 seconds; Gray's head and hand circled in red,
Officer M.B.'s baton identified by blue arrow.***

Officer M.B. attempted to regain her balance but was unable to recover on the marble steps.

She fell down the steps, breaking her helmet.

11



*Image 10: Screenshot from Ex. 7 at 1:52 seconds; Officer M.B. circled in blue.*



*Image 11: Screenshot from Ex. 8 at 00:54 seconds; Officer M.B. circled in blue.*

As Gray remained at the top of the stairs, other officers assisted Officer M.B. down the stairs and escorted her out of the U.S. Capitol building.  Other officers are heard in body-worn camera asking if she is okay.  Once she regained her senses, her main response was asking whether she

still had her duty firearm.

As that was happening outside the building, inside the building, Gray continued to violently push against the group of officers defending the top of the stairs, despite the large presence of police there.





***Images 12, 13: Screenshot from Ex. 9 at 00:39 - 51 seconds; Gray circled in red.***

13

### *Gray Exits the U.S. Capitol Building*

Police officers forced Gray and the other rioters back into the Rotunda, and then out of the east side of the U.S. Capitol building, shown in Image 2 as location "E."   Gray exited the U.S. Capitol building through the East Rotunda door at 3:12 p.m., more than 30 minutes after he illegally entered the building.



***Images 14, 15: Screenshots from Ex. 10 at 2:07-2:20 at # seconds; Gray circled in red.***

14

### ***Gray's Post-Riot Statements***

Gray not only expressed on social media his excitement for the anticipated violence prior to January 6, but he gleefully posted about and discussed his successes after he committed his crimes.   For example, on or around January 6, 2021, Gray sent an Instagram message to another user, stating, "Dude we literally took congress over. I don't wanna say too much more lol was the rowdiest thing I've ever done and you know me lol."

That same day, Gray sent another Instagram message as follows: "We pushed them out the back door of the capital. Pretty sure I can put tear gas on my eggs for breakfast now lol."

In a third conversation on or about January 8, 2021, Gray messaged another user, "Hey brother pretty sure I'm moving back to Jax asap. Bro I was in DC sh[*]t was crazy," and "Lol I was one of the first in the capital. Was detained photoed [sic] the next day."

Then, on or about January 8, 2021, Gray posted an approximately four-minute-long video to his Instagram account.   In the video, he appears to be recording himself as he walks through an unidentified airport, describing his activities at the United States Capitol on January 6, 2021. The photo below is a screenshot from that video.



*Image 16: Screenshot from Ex. 11*

In the four-minute long video, Gray made the following statements:

- "a female cop stole my phone and I got mace'd . . . and I'm like you know what, we're doing this and so we literally pushed them from the front steps of the Capitol all the way back."
- Gray told a group of officers in the Capitol, "Hey, stand down there's too many of us. Go home, go find your wives, go find your kids, you don't want to do this."
- He stormed Nancy Pelosi's office and later came into contact with the female MPD officer from the earlier incident with his phone. The officer started crying, took off her vest, and ran down the stairs.
- "We start pushing the police out the back of the Capitol; we pushed them from the front to the back of the Capitol," and his group of rioters arrived at a staircase and started "pushing them [the police] down the staircase."
- He returned to the Capitol on January 7, 2021, and was immediately detained. "[T]his is far from over, that was the coolest thing I've ever done in my entire life and stay tuned."

Days later, on or about January 11, 2021, Gray then expressed a desire to engage in further violence, messaging another Instagram user: "If Biden is sworn in Im coming back to fight. But I truly dont believe he will be sworn in."   In another social media posts, Gray boasted about how

16

January 6 was "an absolute miracle."   He downplayed his conduct as "nonviolent," stating "I had

my hands down the entire time."   Gray also stated as follows: "To the people who've reached out

saying 'Hey Dan you know, be careful telling your story' - you know, I get it, I understand the

FBI's looking into this.   Like, I have no qualms about what I did whatsoever . . . I did what was

right . . . if they want to do something about that, that's fine, I'm not concerned whatsoever.   You

know, I actually welcome it."

### *Officer M.B.'s Injuries*

MPD Officer M.B. was concussed on January 6 as a result of Gray's assault, which led her

to fall down the stairs and hit her head. When interviewed by the FBI, she recalled that a man in a

dark colored hat began to engage with her at that time, and that she raised her baton to push the

man back.   She recalled that the man reached out and grabbed her baton and shoved her, resulting

in her stumbling backwards and falling down the stairs.   During the fall, she hit her head, resulting

in her bicycle helmet breaking.   As she fell, Officer M.B. felt arms attempting to grab her, but

because she was unsure whether she was receiving assistance from fellow officers or whether

rioters were dragging her down the stairs, she felt extremely frightened.

Following January 6, Officer M.B. sought medical attention for her head injury, for knee

pain, and for back pain.   As a result of her injuries on January 6, Officer M.B. is still being treated

regularly by a chiropractor for a pinched nerve.   She continues to suffer from post-traumatic stress

disorder due to January 6's traumatic events.

### III.    THE CHARGES AND PLEA AGREEMENT

On December 1, 2021, a federal grand jury returned a superseding indictment charging

Gray with nine counts, including Obstruction of an Official Proceeding, in violation of 18 U.S.C.

§ 1512(c)(2), and Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a).   On, October 25, 2023, Gray was convicted of those offenses pursuant to a plea agreement. *See* ECF 93, 94.

## IV.   STATUTORY PENALTIES

As noted by the plea agreement and the Presentence Report ("PSR") issued by the U.S. Probation Office, Count Two carries a maximum sentence of 20 years' imprisonment, a fine of up to $250,000, and a term of supervised release of not more than three years, while Count Three carries a maximum sentence of eight years' imprisonment, a fine of up to $250,000, and a term of supervised release of not more than three years. PSR ¶¶ 121-124.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

That tentative Guidelines analysis in this case, contingent upon the Court's determination of the degree of bodily injury that Gray inflicted on Officer M.B., is as follows:

<u>Count Two: 18 U.S.C. § 1512(c)(2)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property | +8[2] |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[3] | +3 |
| | **Total** | **25** |

<u>Count Three: 18 U.S.C. § 111(a)(1)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[4] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(3)(A) | Bodily Injury | +5 |
| U.S.S.G. § 3A1.2(a)-(b) | Official Victim | +6 |
| | **Total** | **25** |

In the plea agreement, the parties stipulated that Gray was subject to at least a 3-level enhancement under U.S.S.G. § 2A2.2(b)(3)(A) for his infliction of bodily injury on Officer M.B. *See* Plea Agreement, ECF 93 at 3.   There, the government reserved the right to seek a 5-level

---

[2] The Guidelines prescribe an 8-level enhancement if the defendant's obstructive conduct "involved causing or threatening to cause physical injury to a person." U.S.S.G. § 2J1.2(b)(1)(B). Here, the parties stipulated to that 8-level enhancement because there is no dispute that Gray's offense conduct caused physical injury to Officer M.B. Gray also implicitly threatened to cause physical injury to police officers when he admittedly yelled at them, "stand down there's too many of us. Go home, go find your wives, go find your kids, you don't want to do this."

[3] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Gray admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.9 million dollars in losses. As described herein, law enforcement officers from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

[4] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault. Here, Gray's assault on Officer M.B. was an "aggravated assault" because it was committed with "the intent to commit another felony," U.S.S.G. § 2A2.2, cmt n.1. That "other felony" was Gray's obstruction of the Congressional proceeding, in violation of 18 U.S.C. § 1512(c)(2), as charged in Count Two.

enhancement for "serious bodily injury," under § 2A2.2(b)(3)(B), a 7-level enhancement for "permanent bodily injury," under § 2A2.2(b)(3)(C), a 4-level enhancement for injury that was between bodily injury and serious bodily injury under § 2A2.2(b)(3)(D), or a 6-level enhancement for injury between "serious bodily injury" and "permanent bodily injury," pursuant to § 2B2.2(b)(3)(E). *See id*. The Probation Office, for its part, has concluded that Gray inflicted "serious bodily injury" on Officer M.B., warranting a 5-level enhancement under U.S.S.G. § 2A2.2(b)(3)(B). PSR ¶ 131.

The Guidelines define "bodily injury" as "any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. § 1B1.1, cmt. n.1(B).   There can be no serious dispute that Gray inflicted at least "bodily injury" on Officer M.B., as she continues to seek medical attention for injuries she sustained from Gray's assault over three years after it occurred.

The Guidelines define "serious bodily injury" as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1, cmt. n.1(M).   Because Officer M.B. has stated that she suffers from post-traumatic stress disorder, and continues to receive physical therapy for a pinched nerve, the record establishes that Gray also inflicted at least serious bodily injury on Officer M.B. as well.

The Guidelines define "permanent bodily injury or life threatening bodily injury" as "injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent." U.S.S.G. § 1B1.1, cmt. n.1(K). The government is presently seeking

access to Officer M.B.'s medical records to determine if they establish that Gray inflicted "permanent bodily injury" on Officer M.B.   If those records do establish the infliction of such an injury, or an injury between "serious bodily injury" and "permanent bodily injury," the government will so advise the Court in a supplemental submission that will explain why the 7-level or 6-level enhancement is warranted, the effect of such an enhancement on the total adjusted Guidelines range, and a revised recommendation of incarceration.

Therefore, the current combined offense level for Count Three is 25.   With acceptance of responsibility, the total adjusted offense level is 22:

| | |
|---|---|
| **Combined Offense Level** | **25** |
| Acceptance of responsibility (U.S.S.G. § 3E1.1) | <u>-3</u> |
| **Total Adjusted Offense Level:** | **22** |

*See* ECF 93 ¶¶ 4(A).

Here, the parties and Probation agree that Counts Two and Three are grouped under U.S.S.G. § 3D1.4 "because the calculation for Count 3 embodies conduct (assault) that is treated as a specific offense characteristic in Count 2 (namely, USSG §2J1.2(b)(1)(B) – causing or threatening to cause injury to another person or property). USSG §3D1.2(c)." *See* PSR ¶ 51. Under U.S.S.G. § 3D1.2(a)-(c), "the offense level applicable to a Group is the offense level which produces the highest offense level.   Pursuant to USSG §3D1.3(a), the prevailing guideline is USSG §2J1.2, because that guideline produces the highest offense level within the group." *Id.* ¶ 52.

Although the parties and Probation agree that Gray's criminal history places him in Criminal History Category I, the government submits that U.S.S.G. § 4C1.1, a recent amendment

to the Sentencing Guidelines for 2023, does not apply.   Gray does not qualify for U.S.S.G. § 4C1.1's two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria because his conduct meets certain of the section's the exclusionary criteria.   First, Gray is excluded under § 4C1.1(3) because he used violence or threats of violence in connection with the offense.   Gray attacked multiple officers on January 6, one of whom sustained serious bodily injury.   His social media postings prior to and following January 6 confirm his violent conduct and violent intent.   For example, after January 6, he stated, "we pushed [the police] from the front to the back of the Capitol."   Then, he stated, "this is far from over, that was the coolest thing I've ever done in my entire life and stay tuned."   Finally, he reaffirmed his willingness to use violence as follows: "If Biden is sworn in Im coming back to fight."

Thus, Gray both used and threatened the use of violence.   Courts in this District have refused to apply 4C1.1 in similar circumstances. *See, e.g., United States v. Grace*, 21-cr-0138 (RBW), Jan. 30, 2024 Sent. Hr'g (declining to apply § 4C1.1 following conviction under 18 U.S.C. 111(a)); *United States v. Bauer*, 21-cr-00386 (TNM), ECF 195 (Jan. 29, 2024 Memo. Order) (declining to apply § 4C1.1 and holding, *inter alia,* "[t]hough the use of violence or physical force was not an element of any crime of conviction, the Court noted in its verdict announcement that Bauer 'shoved' a police officer. It also credited Officer Coley who testified that Bauer 'be[came] aggressive' and pushed against his baton using both hands while telling him to 'back up.'"); s*ee also, e.g., United States v. Gundersen*, 21-cr-137 (RC); *United States v. Baquero*, 21-cr-702 (JEB).

Accordingly, based on the government's calculation of Gray's total adjusted offense level, after acceptance of responsibility, at 22, Gray's Guidelines imprisonment range is 41 to 51 months'

imprisonment. Gray's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein. *See* ECF 93 ¶ 4(C).

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Gray's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Gray not only expressed on social media his excitement for the anticipated violence prior to January 6, but he gleefully posted about and discussed his successes after he committed his crimes, including pushing at least two officers, and inflicting serious bodily injury on Officer M.B. The nature and circumstances of Gray's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 51 months.

### B.  Gray's History and Characteristics

Gray was a former MMA instructor who has held gainful employment for much of his adult life. PSR ¶¶ 98-112.   Gray was arrested previously on two occasions, once for trespass in 2004 and once for possession of marijuana in 2009, but has been an otherwise law-abiding citizen. *Id.* ¶¶ 66-67.   Nonetheless, his expressed desire for further violence following January 6 is concerning.   This aggravating factor, paired with his assaultive conduct on January 6, weigh in favor of a lengthy term of incarceration.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As this Court has recognized, "[w]e cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building.  What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.   Gray's assaultive and obstructive conduct resulted in a breach of various police lines, and subsequently of the Capitol, that delayed the certification and almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power and throwing the United States into a Constitutional crisis.   Such criminal conduct on January 6, and the pride Gray expressed thereafter for that conduct, embodies a total disrespect for the law. Plainly, a significant sentence is required to reflect the seriousness of Gray's offense and to promote the respect for the law—and law enforcement officers—that Gray's gleeful celebration of his conduct lacked.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[5]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### *Specific Deterrence*

The evidence also indicates that a significant sentence of incarceration is necessary to deter Gray specifically.   Gray celebrated the consequences of his assaults and expressed not only willingness, but his excitement for further future violence.   As noted above, on or around January 6, 2021, Gray sent an Instagram message to another user, stating "Dude we literally took congress over. I don't wanna say too much more lol was the rowdiest thing I've ever done and you know me lol."   That same day, Gray sent another Instagram message, stating, "We pushed them out the back door of the capital. Pretty sure I can put tear gas on my eggs for breakfast now lol." Then, on or about January 11, 2021, Gray then expressed a desire to engage in further violence, messaging another Instagram user, "If Biden is sworn in Im coming back to fight. But I truly dont believe he will be sworn in."   Gray also described January 6 as a "miracle," and downplayed his conduct as "nonviolent," stating "I had my hands down the entire time."   After January 6, Gray also stated that he had "no qualms about what I did whatsoever . . . I did what was right . . . if [the FBI] want[s] to do something about that, that's fine, I'm not concerned whatsoever.   You know, I actually welcome it."

Gray did plead guilty and acknowledge many facts about his criminal conduct that contradict some of Gray's expressed delight in his criminal conduct on January 6.   But he has still not expressed significant remorse.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United*

*States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

**F.    Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr.

at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[7]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. Courts in this District have imposed sentences in a least five prior cases involving both an obstruction conviction under 18 U.S.C. § 1512 and an assault conviction under 18 U.S.C. § 111.[8] Those five cases are the best comparators to Gray's case. In each such case, the court imposed a guidelines sentence due to the nature of the defendants' assaults and the gravity of the January 6, 2021 riot, even when the defendants pointed to strong mitigating facts in their favor. The five cases are:

- *U.S. v. Daniel Scott*, 21-cr-00292 (RCL). Prior to January 6, Scott stated he would "take the fucking Capitol." Then, early on the West Front, Scott bulldozed two USCP officers backward and up a set of steps, allowing other rioters to rush up the stairs and to breach the building about 20 minutes. Scott had no criminal history, but his guidelines range was 51 to 63 months' imprisonment, due to a +2 enhancement for his extensive scope, planning,

---

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[8] Certain of these cases involved Section 1512(k) convictions for conspiring to obstruct the certification, but the penalties and guidelines for that offense are identical to those for a 1512(c)(2) conviction.

or preparation as a Proud Boy.   Like Gray, Scott did not plead early, and he did not express remorse until sentencing.   Scott received a sentence of 60 months' imprisonment.

- *U.S. v. Scott Fairlamb*, 21-cr-120 (RCL). Fairlamb, a former MMA fighter, joined the storming of the police line on the West Terrace, obtaining a police baton, and screaming "What Patriots do? We fuckin' disarm them and then we storm the fuckin' Capitol!" Fairlamb then brandished that same police baton while entering the U.S. Capitol. Later, after isolating an MPD officer from his fellow officers, Fairlamb shoved the officer and then punched his face shield. Two days after the riot, Fairlamb filmed a chilling video threatening future violence, stating, "they pulled the pin on the grenade, and the blackout is coming. What a time to be a patriot."   Unlike Gray, Fairlamb pled guilty quite early after January 6, 2021, and expressed remorse early in the investigation.   Like Gray, Fairlamb had no criminal history.   Fairlamb's guidelines range was 41-51 months, and he received a sentence of 41 months' imprisonment.

- *U.S. v. Duke Wilson*, 21-cr-345 (RCL).   Wilson waded through the crowds and engaged in several acts of violence against police on the Lower West Terrace, including punching them, attempting to take their shields, and throwing objects at them.   Like Gray, Fairlamb had no criminal history.   Wilson's guidelines range was 41-51 months.   Unlike Gray, Wilson pled guilty early.   Wilson was 68 years old and had "been an upstanding citizen all [his] life." Mar. 18, 2022 Sent. Tr., ECF No. 38, at 35.   He received a sentence of 51 months, at the top of the guidelines range, due to his violence in the Lower West Terrace's tunnel.

- *U.S. v. Marshall Neefe and Charles Smith*, 21-cr-567 (RCL).   Neefe and Smith participated, with a large group, in thrusting a large metal sign into the police line.   Both of these defendants' guidelines ranges were 41 to 51 months. At the hearing, the Court noted their youth and family support, but sentenced both to 41 months due to their assaultive conduct and preplanning. Sept. 23, 2022 Sent. Tr. at 49-50.

*U.S. v. Thomas Sibick*, 21-cr-291 (ABJ) is a case over which this Court presided, which is also factually similar to this case.   Sibick joined the mob on the West Front and posted a video of himself on Instagram in which he celebrated his role in the riot.   He entered the Lower West Tunnel and joined in the "heave-ho" concerted push by a mob of rioters against police officers who were blocking the entrance to the Capitol at the end of the tunnel. After leaving the tunnel,

Sibick joined other rioters who attacked MPD Officer Michael Fanone in front of the tunnel mouth. While other rioters attacked Officer Fanone, Sibick stole his police radio and badge. When confronted by FBI agents about the thefts, Sibick repeatedly lied to them about the whereabouts of those items.   After pleading guilty to violating 18 U.S.C. §§ 111(a) and 661, this Court sentenced Sibick to 50 months' incarceration and 36 months' supervised release.

Finally, *U.S. v. Donald Hazard*, 21-cr-00117 (RDM) is another factually similar case to this one.   Although Hazard pled to violating Section 111(b), not Section 1512(c)(2), his conduct was similar to Gray's:   leading up to January 6, he was demonstrably eager for violence.   Then, on January 6, as police officers attempted to hold back rioters from breaching the Capitol, Hazard engaged with them, grabbing an officer, pulling him down a set of concrete steps, and falling on top of another officer. One of those officers sustained extensive, significant, and long-lasting injuries, including a traumatic brain injury and a foot injury requiring surgery. Hazard then continued to confront officers on the west side of the Capitol, yelling at them and spraying a chemical substance at them, and proclaimed he was "storming" the Capitol when he entered the building. In the days that followed, Hazard erased the videos and pictures that he had taken on January 6, and bragged about his participation in the riot.   Hazard received a sentence of 57 months' incarceration.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[9] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer M.B., suffered bodily injury as a result of Gray's assault.  However, the parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Gray must pay $2,000 in restitution, which reflects in part the role Gray played in the riot on January 6.[10] ECF 93 ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Gray's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 132.

---

[9] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[10] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 51 months' incarceration, 3 years' supervised release, $2,000 restitution, and $200 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ Michael L. Jones
MICHAEL L. JONES
DC Bar No. 1047027
Trial Attorney
Capitol Riot Detailee
601 D St. NW Washington, DC 20530
(202) 252-7820
michael.jones@usdoj.gov

SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530
Samantha.Miller@usdoj.gov